Filed 10/15/14  P. v. Syharath CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ANTHONY SYHARATH,<br><br>    Defendant and Appellant. | G048788<br><br>(Super. Ct. No. 11WF1110)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Michael J. Cassidy, Judge.  Affirmed.

Edward J. Haggerty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Melissa Mandel, A. Natasha Cortina, and Ryan H. Peeck, Deputy Attorneys General, for Plaintiff and Respondent.

Anthony Syharath appeals from a judgment after a jury convicted him of aggravated assault with a deadly weapon, domestic battery with corporal injury, dissuading a witness by force or threat, and misdemeanor disobeying a court order, and found true weapon and use of force enhancements. Syharath argues the following: (1) a witness improperly testified concerning his failure to testify in violation of the Fifth Amendment; (2) the trial court erred in admitting prior domestic violence evidence and the evidence and jury instruction violated his due process and equal protection rights; (3) the court erred in instructing the jury on consciousness of guilt; and (4) the court erred in excluding evidence the victim, Bich Tran Huynh, made a prior false claim of domestic violence. None of his contentions have merit, and we affirm the judgment.

FACTS

In April 2011, Huynh and Syharath, who had dated for about two years, lived together in a converted garage in Westminster. On her way home from work one day, Huynh bought wine coolers to share with Syharath. They drank, and at some point they argued over domestic issues. Syharath hit Huynh with a closed fist, including one time on the face. When Huynh tried to leave, Syharath grabbed a knife from a box and stabbed Huynh four times, once in the hip and three times under the right breast. They continued to argue as Huynh bled, and Syharath began to cry. Syharath grabbed Huynh's keys and drove away in her sports utility vehicle (SUV). Huynh went to the hospital.

Westminster Police Officer Stewart Dejong interviewed Huynh at the hospital. Dejong saw scratch marks and redness around Huynh's neck, and the four lacerations, which had been sutured. Huynh was uncooperative and hesitant to speak with Dejong. Huynh told him that she had met an old acquaintance named "Dreamer" in Mile Square Park and he stabbed her. She refused to answer additional questions. Based on her statements, Dejong concluded the stabbing occurred outside of the Westminster Police Department's jurisdiction.

2

A few days later, Huynh's landlord called the Westminster Police Department because he had previously heard yelling and when he looked into Huynh's window, the bedroom was "disheveled." When Officer Travis Hartman arrived, the landlord led him to the window where Hartman saw what appeared to be blood stains on the carpet and mattress. The landlord led Hartman to the front door. When Hartman knocked, the door opened, but no one answered. Hartman saw more blood stains on the carpet, blood stains on the bed sheets and mattress, blood stains throughout the bathroom, and a pair of torn and blood soaked pink underwear next to the closet. Hartman requested additional officers.

Detective James Wilson responded to the residence. Wilson saw a lot of blood throughout the home, including large bloody hand prints on the bed and blood soaked underwear that appeared to have been cut on the side. Wilson searched for, but did not find, a knife.

A couple days later, Detective Michael Nguyen arranged to speak with Huynh at her residence. When Nguyen and Detective Jeremy Hill arrived, Huynh was waiting in the driveway. Huynh appeared scared and would only speak with the detectives if she could sit in their car. Huynh was fairly cooperative in the beginning. She showed them text messages sent from Syharath's cell phone earlier that day that frightened her. One text stated, "'Mai Le Jewelry Store at Asian Garden Mall,'" which was where Huynh's mother worked. The next message read, "'He gave us your mom's address just in case you did call the police on him.'" Additional texts stated, "'Yes, and we know where your son lives at'" and "Keep testing us."

Huynh stated she and Syharath argued constantly and Syharath hit her, so she got a knife, handed it to Syharath, and said, "Why don't you just, you know, fucking kill me." Huynh said Syharath stabbed her; she was wearing jeans, a T-shirt, and boots. However, at some point she also told them she walked into the knife. When Nguyen asked her how she "walked into four stab wounds," Huynh was silent. When Nguyen

3

asked her how her underwear had been cut off, Huynh was silent. Huynh was uncooperative and cantankerous during parts of the interview and said she did not like to be interrogated. Huynh was also evasive on whether she gave Syharath permission to take her SUV and stated she was trying to prevent him from getting into trouble. Huynh did want her SUV back and gave detectives a Long Beach address where they might find Syharath.

With the help of the Long Beach Police Department, officers performed a felony car stop of Syharath, who was still driving Huynh's SUV. Syharath asked Nguyen to retrieve his cell phone from the SUV, which he did, and Nguyen took it to the police station. Officers searched the SUV and found a clothes hamper and boots that appeared to have blood on them.

Officers took Syharath to the Westminster Police Department where Hill and Nguyen interviewed him; the interview was recorded. Syharath admitted he and Huynh dated and had domestic violence problems in the past. With respect to the day of the incident, Syharath said he and Huynh argued because he wanted to move to Fallbrook and Huynh cut herself several times with a knife because she was "nuts." Syharath claimed he tried both to call for help and get the landlord but he was unsuccessful. Syharath said he did not go to the hospital with Huynh but kept in touch via text messages but he deleted them. Syharath claimed Huynh told him to use her SUV to go to his brother's house and gave him her wallet.

An information charged Syharath with attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, subd. (a), 187, subd. (a))[1] (count 1), aggravated assault (§ 245, subd. (a)(1)) (count 2), domestic battery with corporal injury (§ 273.5, subd. (a)) (count 3), dissuading a witness by force or threat (§ 136.1,

---

[1]      All further statutory references are to the Penal Code, unless otherwise indicated.

4

subd. (c)(1)) (count 4), street terrorism (§ 186.22, subd. (a)) (count 5), and misdemeanor disobeying a court order (§ 166, subd. (a)(4)) (count 6).[2]  As to counts 1 and 2, the information alleged Syharath inflicted great bodily injury (§ 12022.7, subd. (a)), and with respect to counts 1 and 3, he personally used a deadly weapon (§ 12022, subd. (b)(1)). The information also alleged he committed count 4 for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)).  Finally, the information alleged he suffered two serious and violent felony convictions (§§ 667, subds. (a)(1), (d) & (e)(2)(A), 1170.12, subds. (b), (c)(2)(A)), and two prior prison terms (§ 667.5, subd. (b)).

Before trial, the prosecutor moved to admit evidence of two prior instances of domestic violence, one on September 17, 2010, and one on January 21, 2011, pursuant to Evidence Code section 1109.  The September 17, 2010, incident involved Syharath throwing a television set at Huynh and destroying her cell phone so she could not call his parole officer.  Syharath pled guilty to battery (§ 242), and damaging a wireless communication device (§ 591.5), and this incident was the basis of count 6 in this case, disobeying a court order.  The January 21, 2011, incident involved Huynh being assaulted and driving herself to the hospital.  Although Huynh initially said four Asian females attacked her, her friend Hue Lam said Huynh admitted it was her boyfriend who beat her up.  Syharath was not charged for this incident.  In his motion, the prosecutor argued the prior domestic violence evidence's probative value was not outweighed by its undue prejudice because the evidence was not more inflammatory than the charged offenses, Syharath was punished for one of the incidents, and admission of the evidence would not consume an undue amount of time.

---

[2]      Before trial, the trial court dismissed count 5 on the prosecutor's motion, and count 6, misdemeanor disobeying a court order, was renumbered count 5.  Because the court dismissed count 5, and the jury did not find the gang allegations true, we have not provided any of the gang evidence in this opinion.

At a pretrial hearing, Syharath objected to admission of the prior domestic violence evidence pursuant to Evidence Code section 352. Syharath argued the incidents were too close in time to the charged offense and they were extremely prejudicial. Syharath added Huynh suffered serious injuries during the January 21, 2011, incident. The prosecutor acknowledged the evidence was prejudicial but its prejudice did not outweigh its probative value. The prosecutor argued the circumstances of the charged offense were more inflammatory than the prior domestic violence evidence. Syharath responded it was unclear whether he was the perpetrator of the January 21, 2011, attack on Huynh. The prosecutor responded the evidence would show Syharath was the perpetrator of that attack. The trial court ruled the prior domestic violence evidence was probative and the probative value outweighed the danger of any undue prejudice.

At trial, Officer Tracy Holz testified for the prosecution. Holz went to a motel on September 17, 2010. Holz approached Syharath and Huynh's motel room and heard yelling and smashing sounds; she called for backup. Holz knocked on the door and identified herself as a police officer. When Huynh opened the door, Holz asked her to come outside, but she refused. When Syharath put his head out of the bathroom door and refused to come out, Holz pulled Huynh out of the room. Syharath eventually complied with Holz's repeated commands to come out of the bathroom, and he laid face down on the floor. The room was in disarray. Holz found a cell phone in the toilet and a television that had been thrown. The parties stipulated Syharath committed a battery on Huynh and destroyed her cell phone to prevent her from calling law enforcement. A criminal protective order was issued preventing Syharath from contacting Huynh.

Hue Kim Lam testified for the prosecution that on January 21, 2011, Huynh called her and frantically said "she was going to fall asleep[.]" Huynh told Lam she could not see, her eye was covered in blood, and she was swerving on the road. When Lam asked her what happened, Huynh said, "'He fucked me up[.]'" Lam assumed

6

Huynh was referring to Syharath. When Lam finally met Huynh at the hospital, Huynh was sitting in a wheelchair distorted with her hair disheveled and clotted with blood.

Huynh testified over the course of three days. Huynh began by stating she did not want to testify, and she was not the model witness to say the least. During the morning session of her first day of testimony, Huynh admitted she was in custody and awaiting trial for possession of a controlled substance for sale, possession of an assault rifle, commercial burglary, and possession of stolen property. As detailed above, Huynh stated Syharath stabbed her four times. During her testimony, she repeatedly nodded instead of answering the questions verbally, and she requested a break soon after beginning. At the afternoon session, Huynh could not continue because she requested a public defender, although she was represented by retained counsel. When the prosecutor indicated he could not contact retained counsel, the trial court ordered the jurors back the next morning. When direct examination resumed the next morning, Huynh continued to nod instead of answering, could not remember answers to questions she answered the prior day, and requested a break. The trial court went to great pains to try to accommodate Huynh and asked her to answer the questions as best she could. Huynh finally admitted it was Syharath who assaulted her on January 21, 2011.

Huynh's testimony on cross-examination was more of the same. She nodded, could not remember, and needed numerous breaks, and again the trial court did its best to accommodate her even when Huynh put her fingers in her ears and sat silent in what appeared to be a catatonic state. Huynh acknowledged telling officers that Dreamer stabbed her in Mile Square Park, but she said it was not true. Initially, she could not remember telling Nguyen she handed the knife to Syharath and told him to kill her. She did remember though telling Nguyen that she walked into the knife but that was a lie. Later, she remembered telling Nguyen she handed the knife to Syharath and told him to kill her. She also acknowledged she told Michelle Goodwin, an Orange County Sheriff's Investigator, that she walked into the knife and that was the truth. When defense counsel

7

asked Huynh why they argued, she answered she did everything and Syharath did not help. When counsel inquired whether Syharath did not do anything, Huynh replied "[e]xcept beat me," "hurt me, and stab me." Huynh stated she still cared about Syharath. She visited him in jail, wrote him letters, gave him money, bought him clothes, and got a tattoo of Syharath's name.

When defense counsel asked Huynh to tell the truth and give her version of the circumstances that led to Syharath stabbing her, Huynh replied numerous times, "Why don't he tell the story . . . ," "Why don't you ask [Syharath]," "Ask [Syharath]," or something similar. Huynh answered in that manner on at least 12 occasions without defense counsel objecting.

Defense counsel asked Huynh whether she knew Derick Stoelting, and Huynh replied she did not remember. Counsel asked whether she was involved in a domestic violence incident with Stoelting where she threw picture frames against the wall causing the glass to break. The trial court sustained the prosecutor's lack of foundation and improper impeachment objections. Counsel asked whether she swallowed broken glass. The court sustained the prosecutor's relevance and improper impeachment objections. Counsel requested a sidebar discussion. At sidebar, after the court questioned the relevance of evidence Huynh swallowed glass, counsel indicated the defense investigator interviewed Stoelting's father who said Huynh accused Stoelting of domestic violence after she threw picture frames against the wall and cut herself and swallowed glass. Counsel said court records establish Stoelting "was sent to prison on domestic violence on July 24, 2012." When counsel spoke with him in prison, Stoelting said he and Huynh argued and fought and she threw a picture frame against the wall. Stoelting did not see Huynh eat glass, but she told him that she did, and he wanted to take her to the hospital, but she refused. Stoelting became more circumspect when he realized he might have to testify. Counsel argued evidence Huynh instigated domestic violence and self-inflicted injuries was relevant to her credibility. Counsel could not provide the

8

court with the date of the incident. The prosecutor responded that although he was "vaguely aware of this[,]" counsel should have presented this in an in limine motion and called a witness to present the evidence. The prosecutor added he did not know counsel was going to question Huynh about Stoelting. Counsel answered he did communicate with the prosecutor about this issue but when Stoelting became uncooperative "it didn't quite turn out as [he] . . . ha[d] hoped." The prosecutor responded that pursuant to Evidence Code section 352 the testimony was confusing and unreliable because Stoelting was convicted of domestic violence. The prosecutor added counsel was asking Huynh to incriminate herself.

The trial court stated Stoelting had to testify to properly explore the issue. The court added the issue could be relevant if counsel laid the proper foundation. The court concluded, "It is improper impeachment because if she denies all this, says 'no', what are you going to do with all that? And you are making an insinuation that you are never going to be able to backup." The court sustained the prosecutor's objection to defense counsel's inquiry.

Syharath's defense was Huynh was "nuts" and although he hit her in the past, Huynh stabbed herself. Jaime Barba, the defense investigator, testified he interviewed Huynh in an unrecorded telephone conversation and Huynh said she stabbed herself. When he tried to clarify, Huynh became confrontational and said, "'That's all you need to know.'" Huynh resisted Barba's subsequent attempts to speak with her. Barba acknowledged domestic violence victims often change their stories.

Michelle Goodwin, Orange County Sheriff's Investigator, testified she interviewed Huynh at the hospital following the stabbing. Huynh told her Dreamer wanted to have sex with her but she refused and he stabbed her before she could escape. Huynh could not remember what happened to her underwear but thought it might have been cut off because she was cut there as well. Huynh was extremely uncooperative and

9

evasive and said she did not want to prosecute her attacker. She denied Syharath would attack her.

Finally, Amy Holmdohl, who was in custody, testified she was Huynh's best friend and a co-defendant in Huynh's pending case. Additionally, she had numerous felony convictions 2005, 2006, 2010, 2011, and 2012. Holmdohl met Huynh after the stabbing. She said Huynh told her that Syharath had beat her and that she had stabbed herself but told the police it was Syharath. Holmdohl said that while they were both incarcerated she sent Syharath a letter offering to testify for him and they became pen pals. Holmdohl said she did not contact the police because other inmates frown upon that.

As relevant here, the trial court instructed the jury Syharath was presumed innocent and the prosecution had to prove his guilt beyond a reasonable doubt (CALCRIM No. 220). The court also instructed the jury with CALCRIM No. 355, "Defendant's Right not to Testify," which stated: "A defendant has an absolute constitutional right not to testify. He or she may rely on the state of the evidence and argue that the People have failed to prove the charges beyond a reasonable doubt. Do not consider, for any reason at all, the fact that the defendant did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

The jury convicted Syharath of counts 2 through 4, and found true he committed count 3 with a deadly weapon and count 4 maliciously or with force. The jury found the other allegations attached to counts 2 and 4 not true. The jury acquitted Syharath of count 1 and its lesser necessarily included offense attempted voluntary manslaughter. At a bifurcated bench trial, the trial court found true all Syharath's prior convictions and prison terms.

Before sentencing, Syharath filed a motion to dismiss his prior felony convictions pursuant to section 1385. At the sentencing hearing, the trial court struck one of the strikes and both prior prison terms and sentenced Syharath to prison for 21 years as

10

follows: the upper term of four years doubled to eight years under the Three Strikes law plus one year for the weapon use enhancement on count 3; one-third the middle term of three years doubled to two years on count 4; and two five-year terms for the prior serious felony convictions.

DISCUSSION

### I. Griffin Error

Acknowledging defense counsel did not object, Syharath argues there was *Griffin*[3] error when during cross-examination, Huynh repeatedly answered defense counsel should "ask [Syharath]." He also argues the trial court erred in failing to admonish Huynh to cease answering in that manner and erred in failing to admonish the jury to disregard those responses. Finally, he argues counsel was ineffective for failing to object. The Attorney General contends the issue is forfeited because defense counsel did not object, the trial court did not have a sua sponte duty to admonish Huynh, the claim is meritless because there is no California authority extending *Griffin* error to witness testimony, and counsel was therefore not ineffective.

We conclude Syharath forfeited appellate review of this issue because he did not object to any of the alleged instances of *Griffin* error (*People v. Lancaster* (2007) 41 Cal.4th 50, 84 [defense's failure to object waives *Griffin* error]), but because he claims his counsel was ineffective, we will address the merits of his claim.

In *Griffin, supra,* 380 U.S. at page 615, the Supreme Court of the United States opined, "We take that in its literal sense and hold that the Fifth Amendment, in its direct application to the Federal Government, and in its bearing on the States by reason of the Fourteenth Amendment, forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." (Fn. omitted.) "''Pursuant to *Griffin*, it is error for a prosecutor to state that certain evidence is

---

[3]          *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*).

11

uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf." [Citation.] We also have said "it is error for the prosecution to refer to the absence of evidence that only the defendant's testimony could provide." [Citations.]" (*People v. Carter* (2005) 36 Cal.4th 1215, 1266.)

Syharath concedes there is no California authority supporting the assertion a *witness's* testimony concerning a defendant testifying implicates *Griffin*. Instead, Syharath cites to three Fifth Circuit Court of Appeals decisions to support his claim a witness's testimony on a defendant's failure to testify constitutes *Griffin* error. (*U.S. v. Lampton* (5th Cir. 1998) 158 F.3d 251, 260 ["well-settled that '[t]he Fifth Amendment prohibits a trial judge, a prosecutor, or a witness from commenting upon a defendant's failure to testify in a criminal trial'"]; *U.S. v. Sylvester* (5th Cir. 1998) 143 F.3d 923, 929 ["Fifth Amendment prohibits a witness from commenting on a defendant's failure to testify in a criminal trial"]; *U.S. v. Rocha* (5th Cir. 1990) 916 F.2d 219, 232 ["Fifth Amendment prohibits a trial judge, a prosecutor or a witness from commenting upon a defendant's failure to testify in a criminal trial"].) Lower federal court decisions on federal questions are persuasive authority, but they are not binding on California Courts of Appeal. (*People v. Zapien* (1993) 4 Cal.4th 929, 989; *Credit Managers Assn. of California v. Countrywide Home Loans, Inc.* (2006) 144 Cal.App.4th 590, 598.)

Because there is no California authority supporting the broad reading of *Griffin* that Syharath advances here, we reject his claim. (See *People v. Carter* (2005) 36 Cal.4th 1114, 1191-1192 [decisions finding *Griffin* error have not extended to situation of defendant who asserts own attorney invited jury to draw adverse inference from defendant's failure to testify].) And we are not persuaded by the Fifth Circuit Court of Appeals jurisprudence Syharath relies on. Those cases are premised on a case where a defendant called co-defendant as a witness knowing co-defendant would not testify and co-defendant's refusal to testify was commented on in the jury's presence. (*U.S. v.*

12

*Kaplan* (5th Cir. 1978) 576 F.2d 598, 600.) That is not the situation we have here. We decline Syharath's invitation to extend *Griffin* beyond its plain language to include a witness's testimony.

Assuming for the sake of argument there was *Griffin* error, Syharath was not prejudiced because there was not a reasonable likelihood Huynh's statements caused the jury to misconstrue or misapply the law. (*People v. Roybal* (1998) 19 Cal.4th 481, 514 [reasonable likelihood standard for *Griffin* error].) Based on a complete reading of Huynh's testimony, we do not view her suggestions to "ask [Syharath]" as a comment on Syharath's refusal to testify. Instead, Huynh's statements must be considered in conjunction with her obvious displeasure with having to testify, as illustrated by her non-responsiveness, numerous requests for breaks, and generally immature demeanor on the witness stand. Second, the trial court instructed the jury it could not consider the fact Syharath did not testify during its deliberations. (*People v. Hajek and Vo* (2014) 58 Cal.4th 1144, 1220 [we presume jurors are intelligent and capable of understanding instructions and applying them to facts of case].) Thus, we conclude Huynh's testimony did not implicate *Griffin*, and assuming it did, Syharath was not prejudiced.

In a related claim, Syharath contends the trial court denied him his right to a fair trial because the court failed to admonish Huynh, instruct the jury to disregard Huynh's statements, and instruct the jury he had a constitutional right to not testify. We agree with Syharath that the trial court has the inherent and statutory discretion to control proceedings to ensure justice is administered. (*People v. Gonzalez* (2006) 38 Cal.4th 932, 951; § 1044; Evid. Code, § 765.) We also agree the trial court has a duty to ensure a defendant receives a fair trial. (*People v. Shambatuyev* (1996) 50 Cal.App.4th 267, 271.) However, the trial court certainly does not have a duty to make objections on the defendant's behalf. Additionally, the trial court does not have a duty to admonish a witness for a statement that, like here, is not prohibited by law. Syharath concedes there is no California authority to support the proposition *Griffin* extends to a witness's

13

testimony on the defendant's failure to testify. On what legal basis would the court rely on in admonishing Huynh?

Finally, given Huynh's demeanor and manner of testifying, it would be reasonable for defense counsel to refrain from objecting to allow Huynh to further discredit herself before the jury. Thus, defense counsel was not ineffective for failing to object. (*People v. Lancaster* (2007) 41 Cal.4th 50, 82 [tactical decision such as failing to object rarely establishes ineffective assistance].) Therefore, the trial court did not err in failing to admonish Huynh when an admonishment would not have been supported by existing California law.

## II. *Prior Domestic Violence*

Syharath raises numerous claims with respect to admission of evidence of prior acts of domestic violence. We will address each in turn.

## A. *Admission of Evidence*

Syharath asserts the trial court erred in admitting the prior domestic violence because although the evidence "had some relevance," it was unduly prejudicial, vague, and confusing. Not so.

Evidence Code section 1101, subdivision (a), prohibits the use of disposition or propensity evidence to prove a defendant's conduct on a specific occasion. (*People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) However, Evidence Code section 1109, subdivision (a)(1), provides, "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is not inadmissible pursuant to [Evidence Code] [s]ection 352."

Evidence Code section 352, however, authorizes a trial court to exclude relevant evidence. "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate

14

undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) For purposes of Evidence Code section 352, prejudice means "'evidence that uniquely tends to evoke an emotional bias against a party as an individual, while having only slight probative value with regard to the issues. [Citation.]'" (*People v. Heard* (2003) 31 Cal.4th 946, 976.) We review a trial court's evidentiary rulings for an abuse of discretion. (*People v. Davis* (2009) 46 Cal.4th 539, 602.) "A trial court abuses its discretion when its ruling 'fall[s] "outside the bounds of reason."' [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 714.)

*People v. Jennings* (2000) 81 Cal.App.4th 1301 (*Jennings*), is instructive. In that case, defendant was convicted of felony assault and aggravated assault by means of force likely to produce great bodily injury and other crimes against his girlfriend. (*Id.* at p. 1305.) The trial court admitted evidence of three prior incidents of domestic violence. In the first, defendant hit the victim three or four times and then kicked in her apartment door. In the second, defendant slapped the victim in a jealous rage. In the third, when the victim refused to drop the domestic violence charges pending as a result of the earlier incidents, defendant straddled the victim in bed, stuck his finger in her eye, hit her on the leg, and choked her. (*Id.* at p. 1307.) The *Jennings* court rejected defendant's contention the trial court erred in not excluding this evidence under Evidence Code section 352, reasoning the prior incidents of domestic abuse "were no more egregious than the charged offense, and posed no danger of confusing the jury. Nor do we believe that any inclination to punish appellant for his prior offenses was a significant factor in this case." (*Jennings, supra,* 81 Cal.App.4th at p. 1315.)

Similar to *Jennings*, here evidence Syharath committed two incidents of domestic violence against Huynh less than one year before the charged offenses was relevant to whether he committed domestic violence here. Syharath concedes the evidence was relevant. And he also concedes the prior domestic violence evidence was

15

no more egregious than the charged offenses. The evidence was not likely to confuse the jury because it involved two isolated incidents and did not consume undue time because Holz's and Lam's testimony was relatively brief.

Syharath's chief complaint is the jury was likely to punish him for prior domestic violence incidents because it was unclear whether he was charged and convicted for those incidents. First, Evidence Code section 1109 does not require the prior domestic violence incident result in a conviction. (See *People v. Escobar* (2000) 82 Cal.App.4th 1085, 1096 (*Escobar*).) Second, the jury could certainly infer Syharath suffered a conviction for the September 17, 2010, incident because the parties stipulated he committed a battery and destroyed her cell phone with the intent to prevent her from calling law enforcement, and a criminal protective order was issued prohibiting Syharath from contacting Huynh. It is true there was no evidence he was punished for the January 21, 2011, incident but this was a factor to consider and was not in itself justification to compel exclusion of the prior domestic violence evidence. Syharath's claim the testimony concerning the January 21, 2011, incident was vague went to its weight and not its admissibility, and was an issue for the jury to decide. (*Ibid.* [whether prior domestic violence occurred straightforward issue of credibility].)

Syharath relies on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), a case involving Evidence Code section 1108, Evidence Code section 1109's parallel statute authorizing admission of prior sexual offense evidence. *Harris* is inapposite.

In *Harris, supra,* 60 Cal.App.4th at pages 731-732, defendant was charged with molesting two adult patients at the mental health facility where he worked. Defendant undressed the victims, touched and licked their private parts, and digitally penetrated them. (*Ibid.*) The trial court allowed the prosecution to offer evidence that 23 years before the charged offenses, a jury found defendant guilty of residential burglary after entering an apartment at night and brutally beating, sexually assaulting, and stabbing the victim with an ice pick while she was sleeping. (*Id.* at pp. 733-734.) The *Harris*

16

court reversed defendant's conviction, reasoning the trial court erred by admitting this evidence under Evidence Code sections 1108 and 352 because the prior sexual offense evidence was remote, was extremely inflammatory, and would confuse the jury by leading it to believe defendant had escaped all but burglary charges. (*Harris, supra,* 60 Cal.App.4th at pp. 738-739.) The court also concluded the prior sexual offense evidence was not probative because the charged and uncharged offenses were largely dissimilar. (*Id.* at p. 740.)

As we explain above, the prior domestic violence evidence was not more inflammatory than the charged offenses, it was not remote as the incidents occurred less than one year before the charged offenses, it was unlikely the jury would confuse the issues, and it was unlikely the jury would punish Syharath for the prior domestic violence incidents as he had been punished for one of them. Thus, the trial court properly admitted the prior domestic violence evidence pursuant to Evidence Code section 1109.

B. *Constitutionality of Evidence Code Section 1109*

In a related argument, Syharath contends Evidence Code section 1109 is unconstitutional in violation of the due process and equal protection clauses. He acknowledges that in *Falsetta, supra,* 21 Cal.4th at pages 912-913, the California Supreme Court rejected a due process challenge to Evidence Code section 1108, a related statute. He also acknowledges California appellate courts have rejected challenges to Evidence Code section 1109 based on both due process and equal protection. (*People v. Brown* (2011) 192 Cal.App.4th 1222, 1233, fn. 14 [due process and equal protection]; *People v. Cabrera* (2007) 152 Cal.App.4th 695, 703-704 [due process]; *People v. Rucker* (2005) 126 Cal.App.4th 1107, 1120 [due process]; *People v. Price* (2004) 120 Cal.App.4th 224, 240 [due process and equal protection]; *Escobar, supra,* 82 Cal.App.4th at pp. 1095-1096 [due process]; *Jennings, supra,* 81 Cal.App.4th at pp. 1309-1313 [due process and equal protection]; *People v. Brown* (2000)

17

77 Cal.App.4th 1324, 1332-1334 [due process]; *People v. Hoover* (2000) 77 Cal.App.4th 1020, 1028-1029 [due process]; *People v. Johnson* (2000) 77 Cal.App.4th 410, 416-420 [due process].)  We find these opinions well reasoned, and we are persuaded to follow them.

Syharath argues, however, that *Falsetta* must be reconsidered in light of the Ninth Circuit's decision in *Garceau v. Woodford* (9th Cir. 2001) 275 F.3d 769 (*Garceau*).  To the extent that *Falsetta* and *Garceau* are in conflict, we must follow *Falsetta*.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 (*Auto Equity Sales*) [California appellate court is bound by California Supreme Court decisions]; *Forsyth v. Jones* (1997) 57 Cal.App.4th 776, 782 [California appellate court is not bound by Ninth Circuit decisions].)  Moreover, even after *Garceau*, our Supreme Court has expressly refused to reconsider *Falsetta*.  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1288-1289.)  We also note that, as Syharath concedes, a different panel of the Ninth Circuit reached a conclusion contrary to *Garceau*; it upheld a federal rule of evidence that was analogous to Evidence Code section 1109.  (*United States v. LeMay* (9th Cir. 2001) 260 F.3d 1018, 1022, 1031.)  Therefore, we conclude Evidence Code section 1109 does not violate the due process and equal protection clauses, but we recognize Syharath raises this issue in part to preserve it for federal review.

*C.  CALCRIM No. 852*

Syharath contends that CALCRIM No. 852, "Evidence of Uncharged Domestic Violence," which instructs the jury on the various purposes for which the jury may consider evidence of prior acts of domestic violence, interferes with the presumption of innocence and the burden of proving defendant's guilt beyond a reasonable doubt.  He acknowledges that in *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016, our high court addressed and rejected the precise claims he raises in this appeal.  We are bound by decisions of our state Supreme Court, as he also acknowledges.  (*Auto Equity Sales, supra,* 57 Cal.2d at p. 456.)  California Courts of Appeal have also rejected the identical

18

claim. (*People v. Johnson* (2008) 164 Cal.App.4th 731, 738-740 [rejecting due process challenge to CALCRIM No. 852]; *People v. Reyes* (2008) 160 Cal.App.4th 246, 250-253 [same].) Therefore, Syharath's claim, which again he raises primarily to preserve the issue for federal review, is meritless.

III. *Consciousness of Guilt Jury Instructions*

Syharath claims CALCRIM Nos. 371 and 372 created impermissible inferences of guilt in violation of his due process rights. We disagree.

The trial court instructed the jury with CALCRIM No. 371, "Consciousness of Guilt: Suppression and Fabrication of Evidence" as follows: "If the defendant tried to hide evidence or discourage someone from testifying against him, that conduct may show that he was aware of his guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." The court also instructed the jury with CALCRIM No. 372, "Defendant's Flight" as follows: "If the defendant fled immediately after the crime was committed that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

Similar CALJIC instructions—2.06 and 2.52—have been approved by the California Supreme Court. (*People v. Morgan* (2007) 42 Cal.4th 593, 621 [rejecting that CALJIC Nos. 2.03, 2.04, and 2.52 violates due process]*People v. Mendoza* (2000) 24 Cal.4th 130, 179-180 [rejecting that CALJIC No. 2.52 violates due process]; *People v. Smithey* (1999) 20 Cal.4th 936, 983 [same]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1223-1224 [rejecting that CALJIC No. 2.06 violates due process].) However, Syharath argues the phrase "aware of his guilt" in CALCRIM Nos. 371 and 372, instead of the phrase "a consciousness of guilt" that appears in CALJIC Nos. 2.06 and 2.52, and was approved by the California Supreme Court, changed the meaning so that these

19

CALCRIM instructions now impermissibly presume the existence of guilt and lower the prosecution's burden of proof.

In *People v. Hernandez Rios* (2007) 151 Cal.App.4th 1154, 1158-1159, the court of appeal rejected the identical argument as it pertained to CALCRIM No. 372. We adopt the reasoning in that case, which equally applies to both CALCRIM Nos. 371 and 372. Thus, Syharath's claims are meritless.

## IV. Huynh's Prior Alleged False Claim of Domestic Violence

Syharath claims the trial court erred in excluding "evidence" Huynh made a prior false claim of domestic violence and denied him his due process and confrontation rights. We will address each contention in turn.

## A. Exclusion of Evidence

Evidence Code section 1103, subdivision (a), provides in relevant part: "In a criminal action, evidence of the character or a trait of character (in the form of an opinion, evidence of reputation, or evidence of specific instances of conduct) of the victim of the crime for which the defendant is being prosecuted is not made inadmissible by [Evidence Code] [s]ection 1101 if the evidence is: [¶] (1) Offered by the defendant to prove conduct of the victim in conformity with the character or trait of character. [¶] (2) Offered by the prosecution to rebut evidence adduced by the defendant under paragraph (1)."

Evidence of a prior false accusation of sexual molestation or rape is relevant on the issue of the victim's credibility and is admissible pursuant to Evidence Code section 1103. (*People v. Tidwell* (2008) 163 Cal.App.4th 1447, 1456-1457 (*Tidwell*).) The admission of the victim's character evidence pursuant to Evidence Code section 1103 is subject to evidentiary rules of relevance (Evid. Code, §§ 210, 350, 351), and prejudice (Evid. Code, § 352). (*People v. Wright* (1985) 39 Cal.3d 576, 587-588.) The trial court is vested with wide discretion in determining the admissibility of evidence

20

and we will reverse only when the court has abused that discretion. (*People v. Jones* (2011) 51 Cal.4th 346, 375-376.)

Relying on *Tidwell*, Syharath asserts evidence of a prior false accusation of domestic violence is relevant on the issue of the victim's credibility and is admissible pursuant to Evidence Code section 1103, despite the fact he found no published cases in the domestic violence context. The Attorney General concedes the relevancy of such testimony but asserts Huynh's alleged false accusation of domestic violence was "unsubstantiated, unreliable, and without any evidentiary support[.]" We agree with the Attorney General.

"An offer of proof must consist of material that is admissible, and it must be specific in indicating the name of the witness and the purpose and content of the testimony to be elicited. [Citation.] '"The substance of evidence to be set forth in a valid offer of proof means the testimony of specific witnesses, writings, material objects, or other things presented to the senses, to be introduced to prove the existence or nonexistence of a fact in issue."'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1176-1177.)

Here, the trial court properly excluded Huynh's testimony concerning an alleged false report of domestic violence involving Stoelting because Syharath failed to lay a proper foundation. Defense counsel failed to identify the actual evidence to be produced but instead identified an issue he hoped to explore. Counsel intended to have Stoelting testify, but when counsel was unsuccessful, he tried to confront Huynh with the unsubstantiated claim she falsely accused Stoelting of domestic violence, despite the fact Stoelting was incarcerated for domestic violence.

Additionally, the line of questioning would have been unduly prejudicial because it would have allowed the jury to infer Huynh made a false claim of domestic violence without any evidence she had done so. The line of questioning would have confused the jury. It would have distracted the jury with an issue that because it was

21

without evidentiary support did not speak to Huynh's credibility. *Tidwell* and *People v. Miranda* (2011) 199 Cal.App.4th 1403 (*Miranda*), are instructive.

In *Tidwell*, the court of appeal affirmed the trial court's decision under Evidence Code section 352 to exclude evidence showing a rape victim possibly fabricated two prior rape accusations. (*Tidwell, supra,* 163 Cal.App.4th at pp. 1457-1458.) The court explained that although the rape victim made inconsistent statements, she did not recant and there was no conclusive evidence she made false rape complaints. (*Id.* at p. 1458.) The court added the evidence was weak because the defense did not obtain statements from the alleged perpetrators. The court concluded admission of the evidence would have required an undue consumption of time because the defense would have tried to strengthen its position and the prosecutor would have introduced evidence the perpetrator raped another woman. (*Ibid*.)

In *Miranda*, the court of appeal affirmed the trial court's exclusion of evidence showing a sexual assault victim had made a prior false accusation of assault. (*Miranda, supra*, 199 Cal.App.4th at p. 1426.) The court explained the probative value of the evidence was slight and there was no clear showing the report, if made by the victim, was false. (*Id.* at p. 1425.) The court added that not only was the evidence weak, "delving into the issue had the potential for confusing the jury and consuming an undue amount of time." (*Id.* at pp. 1425-1426.) Like *Tidwell* and *Miranda*, evidence Huynh falsely accused Stoelting of domestic violence was without evidentiary support and the issue would have consumed an undue amount of time and confused the jury.

Syharath's claim the trial court failed to engage in the required Evidence Code section 352 weighing of probative value against prejudice is belied by the record. The court stated whether Huynh made a false accusation of domestic violence could be relevant had defense counsel laid the proper foundation, i.e., had Stoelting been available to testify. The court considered the evidence was of no probative value because if Huynh denied she made a false accusation of domestic violence against Stoelting, which was

22

likely, defense counsel could not impeach her as Stoelting would not testify. (*People v. Bittaker* (1989) 48 Cal.3d 1046, 1097 [probative value of impeachment evidence depends upon proof prior accusation was false], overruled on other grounds in *People v. Black* (2014) 58 Cal.4th 912, 920.)

Syharath also complains the trial court did not afford him an Evidence Code section 402 evidentiary hearing. For what? Stoelting would not testify. An Evidence Code section 402 hearing would have provided little if any guidance on this issue, and more importantly defense counsel did not request one. We agree with Syharath the central issue in this case was Huynh's allegations against him, but defense counsel's inquiry concerning an unsubstantiated false accusation of domestic violence would not have assisted the jury in deciding that question. Finally, the cases Syharath relies on to argue the trial court erred all involve substantiated false accusations. (*People v. Franklin* (1994) 25 Cal.App.4th 328, 335; *People v. Adams* (1988) 198 Cal.App.3d 10, 16; *People v. Burrell-Hart* (1987) 192 Cal.App.3d 593, 597-598; *People v. Wall* (1979) 95 Cal.App.3d 978, 986.) Thus, the trial court properly excluded Huynh's testimony concerning an alleged false report of domestic violence involving Stoelting.

B. *Confrontation Clause*

A trial court may restrict cross-examination of an adverse witness pursuant to Evidence Code section 352 despite the strictures of the confrontation clause. (*People v. Quartermain* (1997) 16 Cal.4th 600, 623-624 (*Quartermain*).) "[T]he ordinary rules of evidence do not infringe on a defendant's right to present a defense. [Citation.] Trial courts possess the 'traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice.' [Citation.]" (*People v. Frye* (1998) 18 Cal.4th 894, 945 (*Frye*), disapproved on another point by *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22; *People v. Hawthorne* (1992) 4 Cal.4th 43, 57-58.) A trial court's limitation on cross-examination regarding the credibility of a witness does not violate the confrontation clause unless a

23

reasonable jury might have received a significantly different impression of the witness's credibility had the excluded cross-examination been permitted. (*Frye, supra,* 18 Cal.4th at p. 946; *Quartermain, supra,* 16 Cal.4th at pp. 623-624.)

As we explain above, the trial court properly ruled inadmissible Huynh's testimony concerning an alleged false report of domestic violence involving Stoelting. The court's exclusion of evidence on this minor point did not deny Syharath the right to present a defense. (*People v. Cunningham* (2001) 25 Cal.4th 926, 999 [defense evidence on minor point does not implicate due process clause].) Additionally, as Syharath concedes his defense counsel "engaged in effective cross-examination of Huynh," and the jury would not have received a significantly different impression of Huynh's credibility because the alleged false accusation was unsubstantiated, unreliable, and without any evidentiary support. Therefore, Syharath's constitutional rights were not infringed.

## DISPOSITION

The judgment is affirmed.

O'LEARY, P. J.

WE CONCUR:

RYLAARSDAM, J.

IKOLA, J.

24